Good morning, your honors. Ben Coleman for the appellant, Rondale Young. Unless the court had a different preference, I was going to start off with the first two issues, and then to the extent I have time, I'll address some of the other ones. And I'll start with the second issue since that's the issue that the government concedes constitutional error on. So the only question is whether it's harmless beyond a reasonable doubt. It's our position that at least as to the motive element of the Vicar offense, that the error was not the, the government used the unconstitutional evidence to also elicit an improper opinion from their detective that he believed that the statement that was improperly admitted showed that there was a gang retaliation motive for the murder. So it's our position that just on that error alone, this court should reverse at least all the Vicar murder related accounts. This issue does bleed over into the first issue, which is what, what is the government required to show to prove the motive element of the Vicar offense? And it's our position- Can you speak, would you speak just a little slower? Yes, your honor. Hard to understand you. Yes, I'll try, your honor. No, it'd be better, but otherwise I won't get the full flavor of your argument. Okay. So you're speaking on what issue now? Well, I'm addressing the first two issues, which are the second issue is whether there was evidence was admitted in violation of the confrontation clause and the government concedes that that was constitutional error. And so the only question as to that issue was whether they can show harmlessness beyond a reasonable doubt. It's our position that the government used the improper evidence to show the motive element of the Vicar offense because they had their detective use that very evidence to give an opinion that the murder was committed as a gang retaliation murder. And so for that reason alone, all the Vicar motive, all the Vicar murder accounts should be reversed. That's our first position. Okay. So what are those counts? Those are counts two, three, and five. So the only count that would remain is count one, which is the RICO conspiracy count. That's when you claim there was a jury instruction error. That's correct. We also would claim that that count should go due to the error that I just discussed because number one, in their briefs, the government has not argued that that count can be saved. So they've waived any argument as to that count. But number two, the predicates that sustained count one, which is the RICO conspiracy, were witness intimidation, number one, murder, number two, and conspiracy to commit murder, number three. It's our position that the murder and conspiracy to commit murder predicates fall away because they're not due to this error. Those are tainted due to this error. So we're really focusing on these various errors, some of which the government concedes, but we're focusing on the overwhelming, whether they're prejudicial. Correct. Some of them, whether they rise to the level of plain error. Can you talk about why this is plain error or is overly prejudicial to meet that prong? Yes, Your Honor. First of all, the first error that I was discussing, the confrontation clause error, they concede that it was preserved. So it doesn't have to get to plain error as to that one. All right. So that's just a harmless beyond a reasonable doubt standard. The first claim that we've had is a dispute about whether it's plain error or it's preserved. I will concede that the objection was not the best objection in the world. You say the first issue, you're talking about RICO instruction? Yeah, the Vicar instruction. Oh, Vicar instruction is your first issue. Correct. All right. The RICO conspiracy instruction, if you want to go there, is the fourth issue in the brief. There's a dispute as to that one, as to whether it's preserved or plain error. It's our position that the defendant objected at the instruction conference, he submitted a pleading where he objected, and then in the closing argument, when the prosecutor emphasized the defective portion of the instruction, he objected again. So it's our position that, and I can give you an ER site if you need that, Your Honor. No, I don't need it. So it's our position that that issue is preserved as well. You also argue the Miranda violation, which goes to what, the first, goes to the RICO count and the Vicar count? Yes. It's our position that the statements issues taint all the counts, and the government concedes that. They have not argued harmless error in their brief as to the statements issues. So I believe they concede that if the court agrees that there was a problem with admitting the defendant's post-arrest statements, that all counts are vacated, given their waiver in their brief. But if there's not a waiver, then you would argue that the combination of the statements and the combination of the Miranda error, which the government does not concede, and the error which they do concede, what's your conclusion from those two errors? Right. What do you, to what extent are they dependent on the instructional error, or are they independent reasons? Well, we would certainly argue that they are independent reasons for reversal, but on a cumulative error analysis, it's our position that there is ample prejudice in the case so as to vacate all of the counts. The defendant's post-arrest statements and his alleged involvement in the drive-by shooting murder were essentially the essence of the government's case as to his involvement in the RICO conspiracy. Right. Well, in those statements, he admitted that he drove the car that morning. What places Young at the scene of the murder as opposed to his mother's car? Nothing. The evidence that the government has is, best-case scenario, they have the improper evidence that was admitted that Mr. Young was driving the car that morning. They have Mr. Young's statement that he drove the car that morning. I guess you could argue admittedly, in his statement, he said, in his second statement, he said, I was driving the car to the hospital to check on my friend who had just been shot, and he picked up a guy named Paul, and Paul exited the vehicle and then returned with two people. Is all that subject to you, Miranda? Yes. So what is it? Let's assume for the moment that there was a valid Miranda claim, which is his statement, and that there is a confrontation cause claim, which is not disputed other than the effect. If those two claims were found to be proper, what would be left of the government's evidence? What you would have left are cooperating witnesses, gang members who testified as to Mr. Young's involvement in the gang. They do have that. There is a video, in my recollection, that was on YouTube or something like that, where somebody is doing a rap or some type of song, and they're doing a call of all the people in the gang. They're saying their names, and there's a reference to Pueblo Grump, which is my client's nickname, or the evidence is that's my client's nickname. What evidence is there that connects your client to the murder? To the murder? His mother's vehicle? They have witnesses who describe... I suppose this is a question better addressed to the government than to you, and I don't want to take up too much of your time on that, other than to find out what the theories are in the case. Your theory, as I understand it, is you have the instructional error, which you've been talking about. But then when you get to the prejudice of the instructional error, that also brings you to the question of if you just struck the two statements, one that the government admits is improper, and one that you consider to be a Miranda violation. If you struck those two, is it your argument that, aside from instructional error, that there's no sufficient evidence left? Well, certainly it's our position that there's not sufficient evidence to overcome a prejudice finding. I think admittedly, as far as a sufficiency claim, the government gets to rely on improper evidence. No, no, I'm not talking about sufficiency, then, that those two errors in itself are sufficiently prejudicial. That's a separate claim, because I had a little trouble following what claims related to what, and whether instructional error was a necessary argument, and whether that was a separate argument from the fact that the two violations you allege are prejudicial. Correct. I'll try to straighten it out a little bit, if I can. As to the statements issue, in their brief, the government never argued harmless error, as to any of the counts, with respect to that issue. It's our position, and obviously the court can forgive the waiver, but it's our position that if the court finds that the statements were improperly admitted, the post-arrest statements, all counts should be reversed, because the government never argued harmless error in their brief. That's our first position. Okay, now the real position is that if the court finds that the statements were improperly admitted, that in and of itself is prejudicial, as to all the counts. We obviously think you can combine the prejudice with other claims, but as to that claim itself, the jury asked to hear his post-arrest statements again. The government heavily relied on his post-arrest statements in closing arguments. I think for all of these reasons, it's why the government never argued harmlessness in their brief. The evidence is clearly, in our position, harmful. The government hasn't shown harmlessness beyond a reasonable doubt, as to the statements alone, as to all counts. When you're talking about post-arrest statements, be specific. Are you talking about when he was put in a cell with an informant? Is that what you're talking about? Well, the violation, I'm not talking about that. The violation would be when they first arrested him and interrogated him. It's our position that they used his detained mother to coerce the statements, that there was a Miranda violation, and that there was a probable cause to arrest him. Those are our claims. So our position is that those first set of statements, it was an interrogation. I thought you were arguing that it was a Miranda violation because they didn't give him a Miranda warning at the outset, and that he turned into a Siebert violation. Correct. It was a midstream Miranda warning. It's unconstitutional two-step interrogation. Precisely. When I say Miranda, I guess I'll be clear. It was a Siebert, Miranda, two-step invalid interrogation process. So that's the first set of statements, Your Honor. In other words, your position is that they should have given him the Miranda warnings when he first came in to be interrogated at the police station. Absolutely, Your Honor. What did he say that the jury was told that you contend is a result of the failure to give the Miranda warning? Well, at trial, they introduced everything. They introduced the pre-Miranda statements, the post-Miranda statements. He then came back the next day and made more statements to them as well. But weren't the pre- and the post-substantially identical? Did they just come back and ask him all the same questions? They were similar, and he, yes, and he said he was driving his mother's vehicle on the morning of the murder. The key thing. Yes, and that he was worried about his friend who had been shot, and he was driving the vehicle to go to the hospital. He had that cock-and-bull story that these two or three people were out there. They committed a murder, and they thought he was Uber, so they ran and jumped in the back of his car, and he drove a couple of blocks, let them off, and I mean, that's just the story he told. Well, Your Honor, certainly that was the government's position. I can understand Your Honor's skepticism. But what would you call it? Well, I would call it someone whose mother was illegally arrested and is worried that his mother might get in trouble, and so he's trying to come up with something to make sure nothing comes back on his mother. And so it could be a cock-and-bull story, as Your Honor says, but when you go out and someone's mother is arrested for no cause and brought down to the station, and you're told, hey, Mr. Young, your mama is sitting here. You got some serious shit thrown at you. Your mama's car is here. You're not going to put this off on your mama, are you? You're going to come up with a cock-and-bull story to save your mother. I don't have any questions to cock-and-bull story. The question is, if he was not given a Miranda warning before he gave the cock-and-bull story, should the cock-and-bull story be excluded? And our position is yes, and he did give a cock-and-bull story before the Miranda warning. So they arrested the mother because they knew the car had been at the scene? Yes. Okay. And they were holding her when they interrogated him? Yes. Okay. And they seized her car as well without a warrant, entered her home without a warrant, watched her get dressed, made her come in. They took her car and brought her in a police car down to the station and locked her in an interview room. Now, where did this murder take place? Well, it took place in what they claim is 38th Street gang territory. No, what city? It's, you know, I'm not sure. I think the government will know better. At the location. Okay, who were the police? What police department was involved here? Is it Long Beach police? I was trying to find the record. Who were the responsible entities? Who were involved in the big surveillance? I gather it was a joint federal-state kind of task force investigating this gang? Well, yes, but the original arrest was just by local officers. It wasn't a joint task force at that point, or at least as to this incident. Right, and who were the local officers? You know, I think he was brought to Inglewood, and I'm from San Diego, and I just don't know all the ins and outs of the different jurisdictional, but I can look in the record. It says something about Long Beach, and I was just trying to place all of this to make sense of it. I thought he was, I thought this all occurred on about 38th Street. In LA? 38th Street. That's as far as the Coliseum. I think it was near there, Your Honor. No, you don't. 38th Street is not near the Coliseum. Well, it's close. It's that direction. It's close enough for government work. So I'm from San Diego, and I just don't know all the ins and outs. We'll ask the government where it was. Okay, you want to save your... I think I'm over, but if I can get any more time, that'd be great. Are you saying this happened in San Diego? No, that I know it didn't. It didn't happen in San Diego. I know all those streets down there. I used to sell newspapers. I used to go to the football games when we had a team. We had a team thanks to you. In a limousine, and I got to go to football games by selling newspapers, and they'd give me a pass worth 10 cents to go in and watch the game, and then I had to come out early and sell more papers. Which game was it? Was it SC? If I made 40 cents all day, I'd be happy. Okay, thank you, Captain. May it please the Court. Good morning, Your Honors. My name is Frances Lewis. I represent the United States, and with me today is Mack Jenkins. He was trial counsel in this case. I will start by answering some of the fact questions that came up most recently. The murder took place at a car wash at the intersection of 42nd Street and Central in Los Angeles, California. It was in known 38th Street gang territory, and it was handled as a joint task force between the Los Angeles Police Department, the Newton Division, as well as the federal agents that were involved in this case. So who did the precise officers involved in the Miranda interrogation work for? Which LAPD? Yes, they were detectives for LAPD. It was Detective Calzadillas and Detective Torres. From the Newton Division. Correct, Your Honor. And I want to clarify another misconception with respect to the Miranda warnings. The defendant has not argued on appeal that he was not Mirandized. I want to be clear about that. He made that point with the district court. The district court found, as a matter of fact, that he did receive Miranda warnings 20 minutes into his first statement. At most, he had said that he had been at the scene of the initial murder and that he had had his mother's car that morning. The main incriminating statement... Why didn't they give us Miranda warnings right away, immediately? Why did they have to wait 20 minutes? Your Honor, this was litigated at length in the district court. Detective Calzadillas testified at the suppression hearing that he went into the room where the defendant was being held primarily to introduce himself, ask some background questions, and then his intention was to leave, set up the recording device in his notebook, come back, and ask about the investigation. But because defendant immediately started talking, he then stopped him, gave him his Miranda warnings, and when there was an appropriate break in the conversation, that's when he stepped outside of the room. That's when defendant was allowed to speak with his mother. His mother told the defendant at that point that she was free to go, and the mother then decided to stay, at which point the interview continued. This part is all recorded. A transcript is in the record. And that's when he began making the statement. But for what it's worth, the government's position is that his day one statements, frankly, weren't that incriminating. He denied being on Central Avenue during his first statement. He denied being near the car wash, and he denied knowing anything about the murder that took place. It was his second statement on day two. It was his second statement where he acknowledged that he was on Central that morning. That's Exhibit 711, which was the played government's access to records. Why didn't they give him his Miranda warnings immediately? Why? Your Honor, again, Detective Calzadillas testified that he didn't want to interrupt the flow of the conversation. And I should apologize, Your Honor. Detective Calzadillas... That's his duty. He gives the Miranda warnings. I misspoke, Your Honor. Detective Calzadillas testified that he did immediately give the Miranda warnings as soon as the defendant began making statements. After he'd been talking to him for 20 minutes. It's not my understanding... And then he'd gotten to some delicate area where he was talking about what happened. Then he stopped and gave him Miranda warnings. That's not correct, Your Honor. At no point during the first day did the defendant ever acknowledge that he was on Central, that he was with the individuals who ultimately committed the shooting. And Detective Calzadillas, who was found credible by the district judge in this case, testified that as soon as the defendant started making any statements about the case, not just biographical information, that's when he Mirandized him. So there's nothing in the record to suggest that any incriminating statements were made or that those statements were then used before Miranda warnings were given. Judge Otero found that Detective Calzadillas was credible. That doesn't answer my question. Why they didn't give him his Miranda warning immediately. They know, you know, they know who he was, what happened. They had information. And they arrested him. They brought him in. And now they're having a social period with him. You know, that's what you're saying. And then it wasn't until he got into this. Well, the officer first said, you know, I didn't really suspect him of anything. Just brought him in to talk about the car. And then the U.S. Attorney or the D.A. or whoever it was had to remind him that that wasn't true. That he did know that he was a suspect. And that's why he was there. That is correct, Your Honor. Certainly, I would agree that it is good practice to Mirandize someone anytime you walk into a room with them. But Detective Calzadillas testified... No, when you arrest somebody and he's a suspect, then you do it. And you put him in custody. And you're going to talk to him. That's when you do it, right? Yes, Your Honor, absolutely. But Detective Calzadillas testified that as soon as the defendant began making statements about the case, he stopped him and gave him his Miranda Warnings. Yeah, 20 to 40 minutes into that. 20 minutes into that was his testimony, Your Honor. I know that was the officer's testimony. That's not what's in the brief. Your Honor, the officer's testimony was that at 840, he began interviewing the defendant with the intention to give biographical information, establish a rapport. And at 9 a.m. is when he began speaking about the case and gave the Miranda Warnings. Which, again, defendants have not challenged... He didn't need to establish rapport. He had been investigating this for over a week or so. He had talked to a number of other witnesses. They had narrowed in on him being the suspect because the mother said only she and he used the car. And it certainly wasn't the mother who was involved. So even though they continued to hold her while they brought him in, they knew what they were doing. They should have given the Miranda Warnings at the outset. I agree, Your Honor. They should have happened at the outset. This step, you want to talk about a C&B story that he just intended to establish a rapport. Your Honor, Judge Otero listened to a full day of suppression hearing testimony and found Detective Calzadilla's testimony credible. And again, I want to be clear, the defendant has not challenged that he got Miranda Warnings. Yeah, and we review that for clear error. Yes, Your Honor. The focus in this case, however, on appeal right now, is whether or not the statements that he made in the second day were additionally need to be excluded because of a deliberate two-step process, which is just not supported by this record. The evidence is that Detective Calzadilla gave the Miranda Warnings, which was found credible by the district judge. Respectfully, there's not evidence that that was clear error based on the testimony in this case, which was, again, repeated at trial. He was cross-examined about... Wait, slow down and let Judge Pryorson ask his question. I just wanted to say this, that I became a judge in 1965. That was... I think Miranda was out on the books at that time. And... the police were having a big problem in the north San Fernando Valley on when to give and what to say on Miranda Warnings. So there was a place up in Reno where they said you could buy laminated little cards that would recite the Miranda Warning and then they waver. And so I went out and I sent $10 and I got 100 of them. And every time an officer came and fumbled and had problems, I would just hand him one of those cards. Of course, I'd give a copy to the defense lawyers and the public defenders who were there. And I learned from that, from many of them, that giving the Miranda Warning, and I can give you lots of examples, giving the Miranda Warning right off in a nice way helped them solve a fair number of their criminal investigations because that's the way they established their rapport. Now, here I am. Let me tell you these are your rights and I'm required to tell you this. And so listen up and you go through the person that you're getting ready to arrest or discuss a particular matter with and so many of them at that time will just say, all right, here it is. Because they feel that they have someone who is giving them information that they need and they feel a rapport with that person. And, you know, it's been a long time. How many years is it? It's been at least 52 years. But Miranda's problem is that there's no respect for Miranda anymore. There's no respect for her. It's a joke. That's why we run into these problems. Let me tell you what my problem is with this. There's no determination by the district judge as to what was said before or after the warning. The district judge said for the court to conclude that Officer or Detective Calzadillas did not advise the defendant of his constitutional rights, court would also have to conclude that Torres and Fords and Falsified Exhibit U, which was a government exhibit, which said there was a warning given. But it didn't say when. They say that the officers did provide him with the rights. Again, it doesn't say when. Then he says that he believes the officer that he started the interview with the intent not to focus on the particulars of the investigation. He started the interview with the focus of trying to establish a relationship or initial rapport with the defendant. And the core of the interview would take place thereafter. And that explains why he didn't come prepared initially to record the statement and record the rights. So I believe that portion of his testimony. Now, that's not true. He did know that he was a suspect and that he had been arrested. And he did then come in and try to establish a rapport with him as part of his interrogation to establish the right relationship. Now, that's clearly a violation of Miranda. Respectfully, I disagree, Your Honor. And I do want to note that the record can be a bit hard to follow because the audio files from the interview were played and that's, of course, not transcribed. The Miranda warnings were given before the recording was turned on. Yes, of course. That at least helps let us know the statements that came as part of the transcript. The problem is they didn't record the pre-Miranda statements. There's no record of them. The defendant has not argued that the pre-Miranda statements were incriminating. He hasn't. He had. He argued that the two statements, they made him repeat the same statements. It's not my understanding, based on Defendant Young's testimony in the suppression hearing, that he was simply asked to repeat the same statements after he was Miranda-ized. All right, I will look at that again. And certainly, Your Honor, I'd like you to look at the jail recordings and the jail calls that came after it. I have read the jail calls. His statements in which he acknowledged to his mother on a call, not in an interview with officers, they showed me a picture of me driving down Central, of your vehicle driving down Central. You can see your car. She says, Is it my car? Yeah, because you can see the stickers on the back of the window. The defendant has not challenged the admissibility of the jail call and jail overhears. But driving down Central doesn't, I mean, that doesn't place him at the scene of the murder. That is correct, Your Honor, but that placing him at the scene of the murder came during his second statement with the officers. So if there was to be a new trial where we excluded the statements, both sets of statements, pre-Miranda, post-Miranda, he'd still have the jail call. Correct, Your Honor. And I would also just point out that it was our understanding that they were challenging the murder conviction on appeal. Count one, the conspiracy charge. He was also convicted of conspiracy for witness intimidation, which rested entirely on the testimony of a Pueblo Bishops member, CW16, who was not cooperating at the time, and the jail overhear calls with respect to that case. That was not challenged. That's why we did not bring that portion of it. So you showed any one of the three items listed, if you showed any one of the three, if we're talking about not the RICO count, but the other counts, two, four, and five, that all you have to show is one of the three as a pattern of whatever it is, the pattern of how the gang carried out its function. You listed three charges there, witness intimidation, attempted murder, or murder, conspiracy to murder, that all you need to do is prove one of the three? Correct, Your Honor. For RICO conspiracy, they would just need to be able to prove the witness intimidation as part of that, which was amply established. The Vicar, I think, is the one that had the three items listed. No, Your Honor, that was count one, the conspiracy charge listed the three items, murder, conspiracy to commit murder, and witness intimidation, and actually did not specify that the murder and conspiracy to commit murder necessarily related to the Vicar murder of Francisco Cornelio, and there were numerous other cooperating witnesses who testified about a number of other violent acts that the defendant either conspired to commit himself or conspired for the others to commit. But if we were to reverse the conspiracy charge, we would, based on either a Miranda violation or the alleged instructional error, we wouldn't just reverse murder and conspiracy, we'd have to reverse the whole count. No, Your Honor, respectfully, with regard to count one, the only challenge to the witness intimidation portion of that is the specific challenge to the RICO jury instruction on conspiracy. But you can't just reverse just on the overt act. I mean, you have to reverse on the legal theory of the conviction, which is conspiracy. Yes, Your Honor, but that part of the conviction did not rest on either of his two jail statements or the two challenge confrontation clause statements, which related only to the Vicar murder in this case and did not relate to the witness intimidation component, which came through the testimony on December 13th of CW16, that the jail calls showed the defendant trying to figure out who had snitched on him, identifying people by name, and that one of the people he identified by name in that overhear was then beat up by someone else from the gang later on. So I see that I'm out of time. If there are more questions, I'm happy to continue. Otherwise, unless child counsel, the government would submit. There are a lot of complicated issues here, and I don't want to cut you off just because the time ran out. Are there any issues you feel that you have not had an opportunity to comment on? Thank you, Your Honor. The only issue I would comment on, frankly, is with respect to the confrontation clause violation. The government did concede that that was error, but I do think that if you read the trial transcript from start to when that testimony came in, the government had established at that point, beyond a reasonable doubt, not just through the defendant's own words in the statements to the police, but through his own words to his mother, to other Pueblo bishops' members, that he had conspired to and did assist in committing the murder of Francisco Camilo. All right, so then why was it made for trial counsel? Then why elicit this testimony in violation of the confrontation clause if you've already proved your case? Context, Your Honor, and I would be, if Mr. Jenkins would like to speak to it, I'd be happy to let him. That's my frustration with a lot of these trials, is you've already got what you think you need, and then you go and commit constitutional error. I'll let Mr. Jenkins speak to it. No, no, no, no, you just have to defend yourself. I just say, Your Honor, it was done in context. I know why it happened. You think maybe you're going to lose even though you've established the case. Respectfully, Your Honor, no. Absolutely not. And it truly came because the defendant had fought to introduce Gabrielle's testimonial statements over government objection, that this even came in in the first place. And the defendant made a point that Gabrielle had never identified the defendant and that the government had picked the defendant out of its hat on the 22nd. And so, again, we concede it should not have come in, but it was brought in for a legitimate purpose, which was to discredit the cross-examination, that somehow they had no evidence about Young up until they arrested him on September 22nd. It was brought out to explain what the cross-examination point was trying to establish, excuse me, to impeach that cross-examination point, that, yes, the government did have evidence on Young going into their interview on September 22nd. That's why it was brought out. And, again, we concede it would... But that undermines your position on the Miranda issue. No, Your Honor, again, because we concede that they knew that the trust event had made these statements. I don't think when Detective Calzadillas sat down to interview him, he recalled it, because at the suppression hearing, he had to actually have his memory refreshed on that point. But probable cause for arrest relates to totality of the circumstances, all officers' knowledge. And, again, Detective Calzadillas was found credible on this point by the judge. And, respectfully, I don't think there are facts to show clear error in the timing of the Miranda warning. Well, in fact, when he said he came in because he was just going to chat with him, he didn't really know he was the suspect. And he just... That's why he didn't bring the recording things, because he was just going to have a nice little chat with him. And he didn't really think he was the suspect. You know, and then the judge found that credible. Well, good luck. Respectfully, that was not his testimony, that he just wanted to chat with him and did not believe he was the suspect. So he wanted to establish a rapport with him. Correct.  And, again, he has acknowledged himself that he now, as a matter of practice, turns on that recording as soon as he walks into a room. Well, good thing, because... And we agree, that is best practice, and we wish he had done so in this case. But he was not required under the law to do so. He was required to Mirandize. And his testimony, which is not challenged on appeal, is that he Mirandized the witness as soon as he started making statements. Okay. I just... I'm speaking to my locker. I need to re-look at the indictment to separate out these counts and figure out which era goes where. And, Your Honor, the final point I would just make is that even if you accept all the challenges on appeal, count one would still survive. And that does go to the count that... or the comment that I believe Your Honor just made. We didn't think that part, the witness intimidation, it did not appear to be challenged on appeal, which is why our brief didn't go into it. And we do think that survives all the challenges that are being made in this case. Let me just ask you one question, which is not related to an issue raised here. After all of this was when they tried him in the state court and he was acquitted? He was acquitted in the state court about nine months before this trial took place, but there were no jail calls? No, no, no. I'm asking in relation to these conversations we're having about the Miranda warning that after all that occurred, then there was a state trial. There was a long gap, Your Honor. The interview statements took place in September of 2009, and there were basically multiple co-defendants. They tried the other co-defendant first. I'm not asking you because of an issue in this case. I'm just trying to find out the time sequence. All of this occurred, what we've been talking about today, are the interviews and all of that. Then there was a state trial next. Correct. And he was acquitted of murder in the state trial. Correct. And then came the federal trial. With the RICO charges. Because as he would say, you didn't get him the first time, so you try it again with a new jurisdiction. We would disagree with that characterization. That's an issue for the Supreme Court, which I hope will do something, rather than for us. That's not raised before us. Yes, and I actually understand they recently denied cert in the double jeopardy case that the defendant had raised in his reply brief on that issue. But yes, the federal case was, the first indictment was filed in 2010 before the acquittal, and the investigation was ongoing throughout that time. And to be clear, the defendant has conceded in his reply brief at page 15, the jail calls and the jail overhears were not played. And those are the defendant's own words, acknowledging he was on central, trying to figure out who had snitched on him. You don't have to persuade us on that issue, because it's not before us. It's this whole idea of double trials in different jurisdictions. Last time we had that was in the Rodney King case, where the San Fernando Valley jury acquitted the cops, and then they were tried under a civil rights statute and were convicted. That's not exactly what that civil rights statute was meant for, but this certainly isn't. It was for jurisdictions that did not give fair trials to civil rights defendants. But the Supreme Court has interpreted it in a way that would make this valid. And I hope they'll reconsider that sometime. Anything further, Your Honors? Thank you for your time. Thank you. Do you agree that count one stands regardless of all these errors? No, and that's what I wanted to focus on first. The government said that they only needed to prove one racketeering activity, which they said was witness intimidation. And that's just not true. 18 U.S.C. 1961-5, which is cited in my brief, says that in order to show an enterprise, a racketeering enterprise, which is required for a RICO conspiracy, you need to prove two racketeering acts. It says a pattern of racketeering activity... It can be two acts of the same nature, doesn't it? It could be of the same nature, but they need to show... In this case, what they did is they alleged four racketeering activities. They alleged robbery. Jury rejected the robbery allegation. They alleged witness intimidation. They found that. They're correct. And then they alleged conspiracy to commit murder and murder. It's our position that if those two drop out, as we're saying, then on count one, they're just left with one racketeering activity, which is witness intimidation. Well, it could be one activity, witness intimidation, but it could be of two witnesses. Well, the way they alleged it was just one... I mean, they didn't allege witness intimidation number one, witness intimidation number two. They just alleged one witness intimidation. There may be a different issue there if they had alleged... But the witness they alleged was intimidated. Your Honor, I can't remember which one. Okay, I'm going to look at the beginning. But it just alleges one witness intimidation act. That's it. So it's our position. I just think they're wrong when they said they don't need two acts. The statute specifically says it. They didn't oppose that in their response. If I raised that argument and they waived it, because this is the first time I've heard that. Let's go to another question. What did your witness say before the Miranda warning was given and how do we determine that? Okay, I don't think there's any dispute that he said he was driving his mother's car that morning. And that's the big thing. They agree. He said that in that first... It's either 20 to 40 minutes. We don't know because it wasn't recorded and none of the proper things were done. He said, I'm driving my mother's car that morning. At that point, the gig is up because they have him driving the car. So now everything flows from that and that's the problem. They waited until he confessed to driving the car that morning. Then they Mirandized him because now we got him. We got him in the car on the morning of the shooting and now we'll Mirandize him. You know, they hold back all the pictures and the video surveillance and all these things. They hold it back until he confesses to driving the car on the morning of the shooting and then boom. Now we'll Mirandize him. So there's no dispute and that's the critical fact is that he confesses to driving the vehicle. And once they got that, it's all downhill from there. And that's why that midstream, the government keeps on saying we don't contest the Miranda warrants we're given. Well, I mean, the district judge said they were given. What we're contesting is, and they don't dispute, is that they interviewed him for 20 to 40 minutes before they Mirandized him. Got him to give the key confession and then they can run from there. And it was designed with his mother detained there without cause. All this was designed. Okay, well, why is not... I think the quick Judge Pegerson mentioned the calls from the jail cell to his mother. That's admissible, isn't it? Well, we alleged he was illegally arrested without probable cause. And so we think that that could be tainted fruit. And I think that at least it would be subject to an inquiry in the hearing below as to whether the jail calls are a tainted fruit of the Miranda violation. I mean, I don't think this court could probably make that determination in the first instance. Let's assume that the jail calls are admissible. Then what's the standard for determining whether... If there were a Miranda violation and a confrontation violation and the question was did they affect the outcome, or were they prejudicial, or whatever the standard, what would the standard be of determining whether those two violations, if they were true, what effect they have? Who has the burden and what is the standard? Okay, they have the burden to show beyond a reasonable doubt that the errors were harmless. And one thing you didn't hear today, they said, even though he was acquitted in state court and then we had this great case, and then, oh, we just put this statement in for context, but then why did you then ask the detective his opinion as to what the impermissible statement meant? Why did you have to get him to say, oh, it was a gang retaliation murder? Because they needed that evidence to show the motive element of the Vicar offense. Because they had a week, week, week, whatever you want to say about the murder itself, as to the motive, they had nothing. They had no direct evidence that this was ordered by the gang. You need to go and do this. The evidence was that the person, the murder victim, wasn't even a member of the gang. Not even a member of the gang. So they need to shore up that weakness in their case. And that's why they introduced the illegal unconstitutional evidence in violation of the Confrontation Clause. And then that's why they did a second step and violated the evidentiary rules by having their expert testify that it was a gang motive. And that's what you don't hear today. So they had a reason for doing it, and that's why they did it. All right, thank you very much. Thank you both very much. The case is, it will be submitted.
judges: Pregerson, Reinhardt, Wardlaw